## Black, et al. v. Napier, et al.

(Decided December 18. 1925.)

### Appeal from Leslie Circuit Court.

1. Boundaries—Dividing Line Established by Each Owner Giving up Land, Followed by Possession for Long Time, Held Binding. —Agreement establishing dividing line by each party giving up some land to other, followed by actual possession to agreed line, and recognition thereof for long time as true line, is binding.

2. Boundaries—Agreement, Fixing Dividing Line to Settle Controversy Caused by Overlapping Boundaries Shown by Title Papers, Held Binding.—Agreement, fixing dividing line to settle controversy between adjoining owners whose boundaries, as shown by title papers, overlapped, and thereafter recognized by parties as true boundary for long time, will be enforced.

3. Boundaries—Evidence Held to Support Judgment Fixing Compromise Line.—Evidence held to support judgment fixing compromise boundary line.

4. Appeal and Error—Where Court of Appeals is Unable to Determine from Evidence which Party is Right, it will Adopt Chancellor's Finding.—Where Court of Appeals is unable to determine from evidence which party is right, as to location of boundary line, it will adopt chancellor's finding.

JAMES D. BLACK, H. H. OWENS, T. G. LEWIS and W. W. RAWLINGS for appellants.

J. M. MUNCY for appellees.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Affirming.

This suit was instituted in the Leslie circuit court in April, 1923, by John A. Black against appellee, John Napier, and several of his employes, to obtain an injunction restraining Napier and his servants from cutting timber on the lands described in the petition and manufacturing and removing crossties from the lands alleged to be the property of plaintiff, John A. Black. A temporary restraining order was granted Black. On final hearing the petition was dismissed, and the heirs of Black, who is now dead, prosecute this appeal. Napier filed answer denying that he cut any timber from the lands of the plaintiffs described in the petition or that he was threatening or about to do so. Denied that the timber cut stood upon the lands described in the petition or on lands belonging to the plaintiff. By the second para-

graph of the answer Napier averred he was the owner in fee simple and in the actual possession of a certain boundary of land which he described by metes and bounds; he then averred that his boundary was well defined and plainly marked and that he had been in the actual, peaceable, open, notorious, uninterrupted, adverse possession of it, claiming and holding it as his own and occupying it for a period of more than fifteen years next before the commencement of this action, and relied upon the statute of limitations in bar of the right of plaintiff to take any part of it. He admitted he had cut a number of trees from the lands described in his answer and manufactured about 200 ties. The parties then proceeded to take proof. Appellee, Napier, succeeded in proving that the timber cut by him did not stand within the lines of the boundary described in plaintiff's petition. At first plaintiff attempted to prove that the timber did stand within the boundary so described. After much proof was taken the plaintiff filed an amended petition in which it was averred that the boundary set up in his petition was incorrect, although it followed that set out in the Begley patent, upon which he relied, but that it did not follow the lines of the original survey and plat found on the surveyor's book and in the register of the land office, now a part of the auditor's office in Frankfort, and then proceed to set out the boundary as given in the original survey, and filed with his pleadings a protographic copy of the page of the record in the office of the register of the land office on which the original plat and survey are found. He then had the land surveyed according to plat and certificate, and a map made showing the outline of the boundary as originally surveyed, and also as described in the patent, the map being shown on page 317.

The heavy black lines of the map inclose the boundary to which the plaintiffs assert title by the amended petition, while the dotted line, beginning at 6 and running by 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16, etc., indicate the boundary described in the patent. Appellee, Napier, claims the boundary beginning at A and running by B, C, D, E, F, G, H, I, J, K, L, and back to the beginning. The timber cut is described by the little cross marks between the letters C and L on the map. It will thus be seen that if the lands of the plaintiffs are located as described in the patent and the original petition, the timber cut by appellee, Napier, did not belong to the plaintiff, but stood on the outside of his patented boundary. If, however,

the lands of the plaintiff are located as described in the original plat and survey and in the amended petition, then the timber was cut from the plaintiff's boundary, although within the boundary of the survey made in the name of Joseph Murrel, now owned and claimed by appellee, John Napier. Plaintiff owns and claims the Edward Begley 100-acre survey of October 5, 1841, patent No. 6084. Appellee claims under the Murrel patent of date March 24, 1866, for 50 acres, No. 38633. There is but slight conflict between these patents if located as contended by appellee, Napier, but if located as contended by appellant, Black, a large part of the Murrel patent is within the lines of the old Begley patent.

When appellant filed his amended petition asserting the mistake in the boundary as set forth in the original petition and the patent, and averred that the true boundary was as set out in the plat and survey indicated by the heavy black lines numbered from 1 to 15, appellee Napier filed an amended answer in which he asserted title to a boundary including practically all of that embraced by the line running from A by way of B around to L. And further averred that he had been in the actual, open, notorious, continuous possession of this tract for more than fifteen years next before the commencement of the action, claiming and holding it against the plaintiffs and all other persons; that he was holding and claiming this and other lands in 1890 when Joseph Huffaker owned the Edward Begley tract which plaintiffs now claim; that about that time, W. J. Caudill and John A. Black entered into a contract with Huffaker for the purchase of a large boundary of land claimed by Huffaker in Leslie county, including the Begley patent, Huffaker agreeing to clear his title before conveying to Caudill and Black, and that about that time Huffaker instituted an action against appellee in the Leslie circuit court, asserting title to the whole of the Edward Begley survey, alleging that appellee was in the possession of a part of it, claiming and holding it against Huffaker, and praying that appellee be ejected. Appellee answered and asserted title to the Murrel tract and other lands in that vicinity which he had in possession; that while this suit was pending Caudill and an attorney representing Huffaker came to see appellee at his home and entered into a compromise agreement with him whereby Huffaker and Caudill agreed to convey to appellee certain lands claimed by Huffaker and contracted to Caudill and Black, and

which were included in the Begley patent, in consideration of appellee conveying to Huffaker a certain boundary of land beginning at A on the map and running to X; thence to 10; thence to 11; thence to W. and back to the beginning; that pursuant to that agreement appellee and one Baker, who also claimed an interest in the land, conveyed the boundary last above mentioned to Huffaker, and Huffaker conveyed to Baker the boundary lying between 11, 12, 13 and W, and certain other lands to appellee, and thereupon surrendered to appellee all lands south of the line running from W with the dotted line to the figure 9, on the map, thence from 9 by the heavy black line to 8, and from there around the top of the ridge between the John Napier branch and Hell-for-Certain creek; that upon the making and delivery of the deeds Huffaker, Caudill and Black took possession of the boundary deeded to them and have since held and claimed it to a boundary line then established between appellee and them, and appellee immediately took possession to the boundary line fixed between Huffaker, Caudill and Black lands and his own and has continuously held and occupied and claimed the land as his own against Black and all other persons to the commencement of this action and still so claims and holds it. All this he pleaded in estoppel against Black's assertion of title under the Begley plat and certificate, and in answer to his plea of mistake in the description contained in the Begley patent. Issue being joined for the second time the parties again took proof. Appellee practically concedes that the patented boundary is not the same as that described in the plat and certificate upon which the Begley patent was issued, and further concedes, as well he may, that where there is a discrepancy between the calls in the patent and the original plat and certificate upon which it is based, the patent referring to the plat and certificate, the description contained in the latter will prevail and the incorrect patent description must yield to that of the surveyor's report, certificate and plat. Hensley v. Burt & Brabb Lumber Co., 132 Ky. 112; Steele Heirs v. Taylor, 10 Ky. 225; Alexander v. Lively, 5 T. B. Mon. 159, 17 Am. Dec. 50; Bruce v. Taylor, 2 J. J. Marshal 160; Hagins v. Whitaker (Ky.), 42 S. W. 751, 19 Ky. Rep. 1203. But it would seem that if the patent makes no reference to the surveyor's report, certificate and plat these papers even though they exist cannot be relied on to correct the calls of the patent. A very clear statement of

errors in the Edward Begley patent, when read in connection with the map, and the methods employed by skilled surveyors of wide practical experience in locating it, is found in the testimony of one of the civil engineers who testified for appellant Black, the witness saying:

"There is only one timber corner called for in this 100-acre patent and that is the beech, lynn and sugar tree. All the rest of the corners are stake corners. This shows to a surveyor of experience that the lines of this survey were never really run out on the ground. It is what is called a paper survey made in the surveyor's office after he has been on the ground and marked one corner. Therefore, I did not do much surveying on the ground, but I did go to this beginning corner and examine it carefully, and since then I have seen it and observed it several times while in that neighborhood. The beech and sugar trees are standing but there is no lynn there now. I was shown a hole in the ground near the sugar tree and beech by two or three old men who told me they had seen the lynn when standing and they told me it was marked as a corner tree. The beech and sugar trees are plainly and anciently marked as a surveyor's corner, one set of marks on each tree pointing due north the way the first line goes out and another set of marks on each of these trees pointing due south, from which direction the last line comes in to the beginning. It is not possible to correctly survey this patent until certain errors that exist in the patent and in the certificate of survey are first corrected, because when you plat out these calls as given in the two papers last mentioned the survey will not close but will cross itself in two places. The first one of these places is at the black figure 4 on Mr. J. L. Lewis' map filed herein, and marked exhibit JL No. 1. The second one of these crossing places is about midway between black figure 2 and black figure 3. And, besides, the last line will not run due north 30 poles as the certificate of survey and the patent require it to do, but will run about south 10 1r. 15 west, and about 50 poles in order to get back to the beginning. From the black figure 16 on Mr. Lewis' map, which is the end of the next to the last call, if you attempt to run thence north 30 poles to the beginning, you will land at the penciled letter 'K.' The only possible way of correcting these mistakes

—since there is only one timber corner—is by having recourse to the plat written on the margin of the original surveyor's certificate of survey. In making this explanation I have before me a photographic copy of the certificate of survey and its plat. This is a correct representation of the writing sent in to the register's office by Felix J. Gilbert himself, who was the county surveyor who made this survey. Examination of this plat shows that there is a serious error in the 6th line where the certificate calls for the course of this line to be N. 70 E. 40 poles, while the plat that he has attached to explain his work does not run N. E. but runs S. 70 E. This may be seen at a glance by examining this plat on the photographic copy and noting the north and south line which is laid down thereon. The next serious error that I noticed is in the 11th line which the certificate of survey states runs 'East 64 poles to a stake,' but the plat does not show this line at all, and hence I disregard this line, following the rule that I have observed for some years, of construing a boundary that was in doubt so as to make it cover the least number of acres, when this method will cause the rest or remaining part of the boundary to be intelligible and consistent.

"My method, therefore, of locating this boundary is to follow the plat which is entirely consistent with itself. I have done this and have located the boundary accordingly. This location of mine corresponds with the location as given by Mr. James L. Lewis and as shown on his map filed herein by the full unbroken black lines running from the doubt circle and the letters B C to the following numbers, all written in black ink, 1-2-3-4-5-6-7-8-9-10-11-12-13-14-15, and thence north 30 poles back to the beginning at the double circle.

"The attempt to locate the boundary by adhering to the literal courses and distances as given in the patent and certificate of survey would result in exactly the figure Mr. Lewis had drawn on his map running from the doubt circle to the black figures 2, 3, 4, 5, 6, and thence northwardly along the dotted black lines to black figures 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and thence southwest about 50 poles to the beginning. All this last series of black figures marks the intersection of the dotted black lines."

There is, however, a sharp conflict in the evidence as to the making of the compromise agreement between Huffaker, Caudill and Black on the one side, and appellee on the other, appellee maintaining that the deeds and orders of the Leslie circuit court support the averments of his amended answer that the compromise was made, and this is true, and that the plaintiffs and his predecessors in title, relinquished to appellee all lands south of the agreed line, and appellee in consideration of the agreement and compromise deeded to Huffaker for Caudill and Black all land north of the compromise line. He and others testified that the Begley patent had been run out at least twice before Black and Caudill purchased it from Huffaker in 1890 and the line marked, and on these occasions appellee, Napier, says, in making the survey he either carried the chain or marked the line; that the lines then marked and established were as set out in the patent and indicated upon the map by the dotted lines; that all of the citizens in that part of the country who knew or thought they knew the location of the Edward Begley patent, understood the line to be as indicated by the dotted line and not by the solid black lines indicated by 6, 7, 8, 9, 10, 11, 12 and 13, as now claimed by appellants, and relied upon the several surveys and calls of the patent, and upon the fact that all parties had agreed and compromised their differences by fixing the division line at the heavy dark lines, 11, 10, 9, 9, etc., and that each had abided the compromise holding the land on his side of the line for more than fifteen years, claiming it to a well marked and defined line.

For appellant it is contended that the compromise agreement was the result of a mutual mistake, both parties laboring under the misapprehension that the patent boundary was the true and correct boundary of the Edward Begley survey, whereas it has since been learned that there was a material error in the patent beginning with the 6 corner, thence running from there by way of the dotted line to 7, 8, etc. There is no denial, however, that there was a compromise between the predecessors in title of Black and appellee, Napier, fixing the boundary line between their lands. Where the parties have established a dividing line, although in doing so each may have given up some part of his land to the other, and have executed the agreement by each one's taking actual possession of the part allotted to him up to the agreed line, and for a long time thereafter recog-

nized it as the true dividing line, it is held to be a good estoppel. So likewise it is the rule that where two tracts held by different owners interfered the boundary called for by the title papers of one overlapping that of the other, there being a dispute and controversy as to the superiority of the titles, and consequently as to where the true dividing line between the two tracts actually is, an agreement between the parties to establish a dividing line between them in pursuance of which it is established and plainly marked, and thereafter recognized by the parties for a considerable while as the true line between them, it is upheld. Amburgy, &c. v. Burt & Brabb Lumber Co., 121 Ky. 580; Grider v. Davenport, 60 S. W. 866; Berry's v. Evans, 28 Ky. Law Rep. 22; Caudill v. Bayers, 28 Ky. Law Rep. 182; Lost Creek Coal Co. v. Napier's Heirs, 28 Ky. Law Rep. 369.

There is some dispute, however, as to where the compromise line is located. Appellee says the line as fixed by the parties to the compromise is as follows:

"Well, according to this map the corner tree, the beginning corner of the conditional line was just on the north side of the creek, Hell-for-Certain creek, opposite the beginning corner of the Joe Murrel 50-acre survey, and it was to run due north to the going out line of the 100-acre survey, and thence from said beech to the beginning corner of the Joe Murrel survey, thence with its going out line up to the point to the top of the point on the upper side of the John Napier hollow, thence with the point up the point with the middle of it to the top of the big ridge, which is known by the ridge between Hell-for-Certain creek and Big fork of Hell-for-Certain.

"Q. 15. Who was by, or present, when this line was made? Well, I was there, William Caudill, E. Y. Begley, John North, John A. Muncy, now dead, and somebody else that I don't remember who it was.

"Q. 16. Was anything marked there to show or indicate the line? A. Yes, sir.

"17. Tell what it was. A. Beech tree, standing near the road, on the bank of the creek.

"18. Say whether or not anybody was there who represented the plaintiff, Joseph Huffaker, when this line was established and agreed upon? A. Well, I don't just remember whether anybody except William Caudill and I.

"19. Was this line made and agreed upon before this suit was dismissed, or afterwards? A. It was agreed on before.

"20. Say whether or not you and Mr. James Baker made a deed to Joseph Huffaker before or after you had agreed on this line? A. It was afterwards.

.  .  .

"68. Well, at the time you and Mr. Baker and Huffaker and Caudill made this compromise, you and Mr. Baker had agreed to convey to Mr. Huffaker 55 acres lying inside of the Edward Begley survey? A. Yes, sir, running with the patent lines.

"69. And Mr. Huffaker, in consideration of that compromise, and the conveyance to him of the 55 acres, agreed to convey to James Baker 25 acres off of the most eastern end of the Edward Begley, did he not? And also another Edward Begley survey? A. The understanding was that Huffaker was to convey to me, John Napier and Jim Baker, all the land contained in the Edward Begley claims on the creek below an agreed line that was made between me and William Caudill, except the 55 acres contained in the 100-acre patent.

"70. And in compliance with that agreement you and James Baker conveyed to Mr. Huffaker the 55 acres you have spoke of? A. Yes, sir.

.  .  .

"72. Speaking of this conditional line in your direct examination, I will ask you to point out again where the conditional line begun and run to? A. Beginning at the beech on the north side of the creek and running north to the outside patent line of the Edward Begley survey, thence running from the beech to the beginning corner of the Joe Murrel, then up the point to the top of the big ridge."

We think the preponderance of the evidence supports the judgment of the chancellor fixing and adjudging that the compromise line is located as contended by appellee, Napier. His finding is entitled to some weight. We are unable to say from the evidence for a certainty which of the parties is right in his contention. The mind being left in doubt, the court will adopt the finding of the chancellor.

Judgment affirmed.